**Pettit v. Chester County Hospital**

C. *Barry Buckley,* for plaintiff.
*Kevin Holleran,* for defendants.
*Patrick C. Campbell, amicus curiae.*

WOOD, *J.,* August 25, 1982—We are called upon here to decide whether or not Dorothy F. Pettit, the mother of Patti Anne Wunsch, who presently lies in a coma in the Chester County Hospital, should be permitted to give consent on behalf of Patti Anne to have an abortion performed upon her. There are significant questions affecting human existence present in this case. The nature of the case has led to considerable public interest and controversy, and a regrettable intrusion upon the privacy of petitioner in this time of travail. Our approach has been to set aside personal views concerning the morality or immorality of abortion, and to attempt to discern what the law requires. Our oath of office requires no less.

Patti Anne was injured in an accident on June 24, 1982, and has been in a coma since that date. On July 2, 1982, her attending physicians discovered that she was pregnant. It is a stipulated matter of record, and therefore binding on us, that although the presence in her body of a growing fetus may to some extent compromise Patti Anne's chances for recovery, medical opinion is that at present an abortion is not necessary to preserve her life. She is presently nine to eleven weeks pregnant.

It is also stipulated of record, and therefore binding upon us, that Patti Anne's condition is detrimen-

tal to the growth and development of the fetus and that if the pregnancy goes to full term, the result will likely be an abnormal child.

Patti Anne is unmarried, and on August 6, 1982, we appointed her mother, Dorothy F. Pettit, as the guardian of her person. In that capacity, Mrs. Pettit has given informed consent for an abortion to be performed upon Patti Anne. However, the Chester County Hospital, where Patti Anne is a patient, has taken the position that the informed consent of a guardian is not sufficient to enable them to perform an abortion without facing criminal consequences under the "Abortion Control Act", Act of September 10, 1974, P.L. 639, No. 209, 35 P.S. §6601, et seq., and so Ms. Pettit has applied to this court for a declaratory judgment that her informed consent is sufficient, and that the physicians may perform the abortion without fear of criminal consequences.[1]

The relevant provisions of the Abortion Control Act read as follows:

"(a) No abortion shall be performed upon any person in the absence of informed consent thereto by such person. Notwithstanding the foregoing provisions of this subsection, an abortion may be performed on any person if, in the medical judgment of a licensed physician an abortion is immediately necessary to preserve the life of the woman and the woman is unable to give consent." 35 P.S. §6603(a). We are not aware of any court decision, in the Pennsylvania or Federal systems, which has interpreted

---

1. In addition to the parties to this proceeding, set forth above, we permitted Patrick C. Campbell, Esq., to file a brief amicus curiae on behalf of CCCAL. We did so in order to obtain the most vigorous presentation possible on both sides of this issue, and we thank all counsel for their able assistance.

this language in a context even remotely approaching the situation we have here.[2]

It is clear beyond argument that if Patti Anne were able to give an informed consent herself, she would be entitled to have an abortion performed upon her by any doctor who would agree to do so. We have examined all the case law that we were able to discover on the authority of a guardian of the person to give consent to various surgical procedures on behalf of an incompetent, and find that they uniformly attribute such authority to the guardian in a variety of situations, where there is no legislation limiting the guardian's authority: In Re: Scholvin, 47 Northumb. 206 (1974); In Re: Null, 70 D.&C.2d 270 (1974); In the Matter of Mary Moe, 385 Mass. App. 555, 432 N.E. 2d 712 (1982); see also 20 Pa. C.S. §3332.

The difficulty here is in the wording of the statute itself. The first sentence of §6603(a) provides, in effect, for abortion upon request. The second section, however, says that where "the woman is unable to give consent", an abortion may be performed only if, "in the medical judgment of a licensed physician", such a procedure is "immediately necessary to preserve the life of the woman". In other words, the legislature contemplated that there would be times where a woman is not able to act for herself, and rather than say that a guardian could act for her in those situations, the legislation restricted the attending physician to acting only if the procedure is

---

2. Ironically, there is currently in existence a Pennsylvania statute, recently passed, which provides a specific procedure in this kind of case; Act of June 7, 1982, P.L. No. 439. If that statute had been in effect, the abortion no doubt would already have occurred. However, it doesn't become effective until December 7, 1982.

necessary to save the woman's life. We cannot, then, interpret the statute itself in any other way than as holding that the informed consent of a guardian is not sufficient in the case of a comatose woman.

The next question that we must address is whether the statute, and particularly the second sentence of §6603(a), is valid, or whether it in some fashion amounts to an unconstitutional deprivation of the rights of Patti Anne Wunsch in the context of this case.

Because the statute appears to treat competent and incompetent persons differently, we first considered whether or not the Abortion Control Act violated the Equal Protection clause of the 14th Amendment to the United States Constitution. We found no cases involving abortion. We did, however, locate a group of cases from other jurisdictions which have considered the question of whether the state may treat incompetent persons differently from competent persons in the context of legally permitted sterilization procedures. In many respects sterilization cases are analogous to the abortion situation because they involve the right to procreation, particularly if one takes the view of the United States Supreme Court, as expressed in Roe v. Wade, 410 U.S. 959, 93 S. Ct. 1409 (1973), that during the first trimester of pregnancy abortion is very little different from any other surgical procedure.

We considered the case of In the Matter of Mary Moe, supra, to be perhaps the clearest exponent of the equal protection theory. In that matter, the mother of a mentally retarded daughter filed a petition asking the court to approve a sterilization operation on her daughter, and the same question arose there that was raised here: it was argued that

the guardian was not the proper person to give consent in such a delicate and personal matter. The Massachusetts court held otherwise, and pointed out that the very purpose for appointing a guardian was because the incompetent was legally unable to exercise her rights in an informed manner, and that indeed it would deprive the incompetent of the same protections to which a competent person is entitled if the incompetent were not able to speak through a guardian.[3] The Massachusetts court then went on to spell out in some detail the kind of information and analysis a guardian should undertake before giving consent, and the procedures for determining the adequacy of a guardian's consent.

Without spelling those steps out in detail, we must observe that if the same requirements were to be imposed upon Dorothy Pettit and this court in this case, we would undoubtedly be well into Patti Anne's second trimester before a decision could be made. However, as will be observed further in this opinion, Roe v. Wade, supra, provides a constitutional basis for our decision which more or less usurps the analysis set forth in Mary Moe. As it turns out, the significance of Mary Moe for us is to underscore the plenary authority of a court-appointed guardian in acting on behalf of an incompetent, to insure that the incompetent is accorded the same rights as a competent person.

The next line of analysis was to decide whether or not the Abortion Control Act violates the Due Process Clause of the 14th Amendment of the United States Constitution. As noted, we believe that the

---

3. To the same effect, but with slightly different emphasis, one might wish to examine the cases of In the Matter of Lee Ann Grady, 85 N.J. 235, 426 A.2d 467, and, at the Superior Court level, 170 N.J. Super. 98, 405 A.2d 851 (1979).

plain meaning of the statute is that in the case of a comatose woman, the second sentence of §6603 applies. That sentence, in effect, provides that an abortion may be performed upon a woman unable to give consent only if necessary to save her life. We then turn to Roe v. Wade, supra. In Roe v. Wade, after a lengthy discussion of the historical aspects of abortion and the state of modern medical literature on the subject, the Supreme Court quite clearly makes the following pronouncement:

"1. A state criminal abortion statute of the current Texas type, that excepts from criminality only a life-saving procedure on behalf of the mother, without recognition of the other interests involved, is violative of the Due Process Clause of the Fourteenth Amendment.

(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician." Roe v. Wade, supra, at 732.

In other words, a statute that says an abortion may be performed only in a life saving situation, and provides criminal penalties for those who act otherwise, violates the United States Constitution.

One may disagree with the Supreme Court's articulation of guaranteed rights, and may hold differing views as to the morality of a given decision. Nevertheless, when the Supreme Court speaks, on Federal Constitutional matters, this court must listen. The very fabric of our judicial system would come apart at the seams if each court were at liberty to make its own law on controversial subjects. We must, therefore, hold that the second sentence of section 6603(a) of the Abortion Control Act is offensive to the Due Process Clause of the United States Constitution, and is therefore invalid as a limitation upon the actions of the parties in this matter.

What law or standards do we put in its place, if any? We have, of course, the pronouncement of the Supreme Court quoted above, saying that during the first trimester the abortion decision "must be left to the medical judgment of the pregnant woman's attending physician". What standard is that physician to apply? We turn next to Doe v. Bolton, 410 U.S. 192, 93 S. Ct. 739 (1973), a companion case to Roe v. Wade. In Doe v. Bolton there was a somewhat similar statute, from which the court struck out the requirement that a physician should find that the procedure was necessary to save the mother's life, and left standing only the phrase that the decision should be "based upon his best clinical judgment that an abortion is necessary". The court then went on to say that this language was capable of interpretation because it meant that the physician should use his "best clinical" judgment in the light of all the attendant circumstances. The court notes that the physician should consider the physical, emotional, psychological, familial, and age factors affecting the patient. This is the standard which the Supreme Court has given us, and which we pass on to the attending physicians in this case. See also Colautti v. Franklin, 439 U.S. 388, 99 S. Ct. 675, at 681 (1979).

We will add to the above factors, the following: in our estimation, the attending physician should consider also the possibility that the fetus may come to full term and be born and enjoy a meaningful existence. Although the Supreme Court does not mention that factor, we consider that in a civilized and caring society it would be callous to require otherwise.

In closing, however, we stress that the decision is the physician's to make. We will declare what we think the law is, but for the first trimester at least,

the law is that the physician must do what he or she thinks is necessary for the health of the patient, taking into consideration the factors mentioned above.

In response to the questions posed in the action for declaratory judgment, we declare as follows:

1. We are asked to declare that plaintiff is the proper individual to offer an informed consent for the performance of an abortion upon the person of the incompetent. We declare that the guardian is authorized to consent to surgical procedures upon the incompetent, but that the decision whether to perform those procedures is left to the judgment of the attending physician, based on the criteria set forth in our opinion.

2. We are asked to state that the informed consent of the guardian is sufficient compliance with the provisions of the Abortion Control Act. The answer to that one is no, although, of course, as we have noted above, the operable provision of the act is unconstitutional anyway.

3. We have been asked to declare that Chester County Hospital and its physicians will not be subject to prosecution for violation of the Abortion Control Act by performing an abortion. As noted, we find the second sentence of §6603 subsection (a) to be unconstitutional, and we consider that as long as the physicians do what is constitutionally mandated, that is, make their decision on the basis of the criteria and factors set forth in our opinion, they will have complied with the requirements of law.

In the event an abortion does not occur in the first trimester, and further clarification becomes necessary, we retain jurisdiction.